No. 7573.

VALENTINE VREDENBURG ET AL. VS. W. J. BEHAN ET AL.

No. 7917.

W. J. BEHAN VS. VALENTINE VREDENBURG ET AL.

(Consolidated.)

33   627
47  1081
33   627
51   115
33   627
117   985

The doctrine of contributory negligence should not be carried to the point of holding the injured party not entitled to damages, on account of acts of his employees, which are not connected with their employment.

The responsibility of persons who keep ferocious animals is of such strict and grave character as not to be relieved or modified by the ordinary considerations which regulate claims for damages. The very keeping of such animals is an unlawful act and, therefore, the injury done by them when they get loose, gives rise to an action for damages under all circumstances.

When persons sued to be made liable for their acts, seek to escape such liability by pleading some privilege or immunity in derogation of common right, they must clearly establish the existence of the same, and bring themselves strictly within the provisions of the law on which they rest such claim.

The "Crescent City Rifle Club" is not a Corporation. It was organized under the law providing for the creation of Corporations for "literary, scientific and charitable purposes." The declared object of said association does not fall within the purview, the letter or the spirit, of the law relied upon. Rifle shooting is not a science, though it may be an art.

The fact that one of the Defendants, the president of said association, was not aware of the keeping of the bear on their premises, does not exonerate him from liability.

The discontinuance of the suit against some of the solidary obligors does not discharge the other Defendants.

Citation against some of the solidary obligors, interrupts prescription against the others.

The charge of the judge *a quo* to the jury, that "damages can be claimed by the heirs of the deceased for the loss of his life," is clearly erroneous. A number of adjudications of this Court declare that no such action lies in favor of the heirs. The Act of 1855, amending Article 2315, C. C., expressly limits their right to such action as the deceased himself would have had for damages had he survived the injury.

APPEAL from the Sixth District Court for the parish of Orleans. *Rightor*, J.

---

*E. Howard McCaleb* for Plaintiffs and Appellees:

First—Where there are a number of defendants represented by three attorneys, the alleged inability of one attorney to be present during the trial, because of his professional engagements elsewhere as Assistant City Attorney, is no ground for a continuance, when the application is not supported by affidavit, and when the record shows that notwithstanding said statement he was present during the whole of the trial in the court below. More especially should this rule be adhered to in the present case where the parties represented by such attorney have since acquiesced in the judgment, are no longer before the Appellate Court, and the objection is raised here by other counsel representing other parties. It would be a vain thing to grant a new trial on such ground, after the attorney and his clients have retired from the case. 7 A. 453; 2 L. 207; 12 L. 592; 13 L. 424; 1 R. 90; 18 A. 291; 19 A. 268.

Second—Where a number of defendants sued *in solido* sever in their defense, and one of them makes an affidavit for a new trial, on the ground of newly discovered evidence, such appli-

Vredenburg et al. vs. Behan et al.

cation will be disregarded and refused, (1) when the party making the affidavit has since acquiesced in the judgment, (2) when the parties seeking to take advantage of such application, have made no affidavit whatever, (3) when neither the competency (9 R. 170) nor residence of the witness is shown, (4) nor from whom, when, where, nor in what manner the alleged newly discovered evidence was obtained.  6 N. S. 327.  One defendant cannot make the affidavit for others to obtain a new trial.  3 N. S. 129; 2 A. 796–1019.

Due diligence in obtaining evidence is a question for the Court not the party to determine.  3 N. S. 170.  An affidavit of newly discovered evidence made to obtain a new trial, after a case has been tried twice, and sixteen months after the institution of the suit, does not show due diligence, nor does the affiant make his vigilance apparent.  2 A. 626.  Where parties have agreed to try a cause upon the same evidence and testimony taken on a previous trial, an application for a new trial on the ground of newly discovered evidence made in direct violation of such agreement will not be listened to.

*Consensus facit legem et tollit errorem.*

Third—The form of a general verdict when in strict compliance with Art. 522 C. P. is not open to objection.  17 A. 166.  The singular is often employed to designate several persons. Rev. C. C. Art. 3556.

Fourth—Where a number of defendants are sued *in solido* for damages arising from an offense or quasi-offense, a discontinuance of the suit as to some of them, does not operate as a conventional discharge or remission of the debt as to the others;—for after discontinuing, plaintiff may bring his action anew.  C. P. Art. 492; 2 A. 756.

Fifth—Suit brought against one or more of the debtors *in solido* interrupts prescription as to all.  Rev. C. C. Arts. 2097, 3552.

"Cotresspassers being bound *in solido*, suit against one interrupts prescription as to all."  21 A. 541.

Sixth—"Although the judge may have charged the jury improperly, yet if the evidence would not have authorized a different verdict, it will be upheld."  7 A. 678; 10 A. 150.

Seventh—"Entries in club and society books, when kept by the proper officer and accessible to all the members, are admissible in evidence against such members, who will be treated as privies to the proceedings therein recorded."  Wharton's Law of Evidence, § 1131; 2 C. & P. 556; 1 Stark, 405; 5 Ex. 147; 6 Hill N. Y. 318.

Eighth—It is no answer to an action for damages caused by a ferocious beast kept by defendants in violation of a penal, prohibitory municipal ordinance (Leovy's City Laws and Ordinances, Art. 703) to show that plaintiff's servant had provoked or worried such beast or "that the party injured was himself guilty of some imprudence or negligence" (Starkie on Evidence 533, Vol. 2—2 Str. 1264), because the possessor of a dangerous agency, whether animate or inanimate, is bound at his peril to guard it so it can do no harm, and if it escape will be liable for all resulting injury.  Wharton's Law of Negligence, § 860; 17 Wall. 657; 4 Allen, 431.

Ninth—Masters are not responsible for the acts of their servants beyond the scope of their employment.  Rev. C. C. 2320, 3010.  Especially where the act of the servant was done out of the master's presence, in violation of his orders and when it was impossible for him to have prevented such act.

Tenth—When defendants have by their acts and conduct acknowledged their liability, after an injury has been done by a wild beast kept by them upon their premises, *ante litum motam*, or have in their pleadings claimed to be released from the debt so created by remission or conventional discharge of other tortfeasors with whom they are bound *in solido*, they will be estopped from subsequently denying their liability for the injury sustained.

A plea of extinguishment or remission of a debt or obligation of any kind is an admission of its existence and validity, which will estop the party making such plea from contesting the correctness of the obligation alleged to have been extinguished.  H. D. p. 1157.

Eleventh—Those who keep ferocious animals are liable for all damages caused by them. Exodus, Chap. XXI, V. 29 and 30; Twelve Tables VII; Cooper's Justinian Lib. IV. Tit. IX, § 1, p. 358; Partida Law 23; Seventh Title XV, C. N. Arts. 1384, 1385; Domat, Part I,

Book II, IX—1568 ; Merlin Repertoire Animaux, p. 416, Vol. 1, ib. 3 "*Blesse*, 11 p. 186, ib. Verbo " Quasi-Delit, 26 p. 242.

It matters not whether defendants were owners or proprietors, the mere keeping of such animal, a Bear, by them was unlawful, and is sufficient to render them responsible. Marcade, Tome 5, pp. 272 and 273 ; Toullier, Vol. II, No. 298 ; Addison on Torts, p. 22, 185 ; Sherman & Redfield on Negligence, § 188 ; Wharton's Law of Negligence, §§ 917, 918, 919, 920 and 923 ; Hale's Pleas of the Crown, Vol. 1, *430 ; May vs. Burdett, 9 A. and E. 100 ; 1 Foster & Finlaison, 92 ; 1 Comstock, 515 ; 8 Barb. 630 ; 38 Barb. 14 ; 41 Cal. 138 ; 16 Ind. 257 ; 52 Me. 178 ; Spring Co. vs. Edgar, 99 U. S. 645.

Twelfth—" The harboring a Bear about one's premises, or allowing him to be chained or kept there, is a sufficient keeping to support the action. It was the duty of the persons having charge of the premises, to have sent the Bear away or to have caused him to be destroyed." Lord Tenterdon, C. J., in McKone vs. Wood. 5 C. and P., (2 Eng. Com. L. R., p. 25.) " Whoever brings on his lands and collects and keeps there anything likely to do mischief, if it escapes, must keep it at his peril ; and if he does not do so. is *prima facie* liable for all the damage which is the natural consequence of its escape." Justice Blackburn in Fletcher vs. Rylands, Eng. and I. Appeals, 3 Law Reports, 330.

Thirteenth—There is no such thing as a " tame Bear."

"The statement in the declaration that the defendant knew the bear to be of a fierce nature, must be taken to be proved, as every one must know that such animals as lions and bears are of a savage nature. For though such nature may sleep for a time, this case shows that it may wake up at any time. A person who keeps such an animal is bound so to keep it, that it shall do no damage. If it be insufficiently kept, or so kept that a person passing it is not sufficiently protected, the owner is liable." Crowdor, J., in Besozzi vs. Harris, 1 Foster & Finlaison, Nisi Prius, R. p. 92.

Fourteenth—The surviving widow and children of a deceased person may recover all damages suffered by the deceased from injuries inflicted by a ferocious Bear kept by defendants. The widow and children are subrogated to all the rights of the deceased sufferer. R. C. C. Art. 2315 ; 20 A. 25 ; 27 A. 713. The jury are the proper judges of the quantum of damages (17 A. 19 ; 23 A. 181), but if the evidence authorize it, the amount may be increased by the Appellate Court. 11 A. 645.

Fifteenth—A corporation " organized " for the purpose of cultivating the science of rifle shooting under the general laws of the State, has no legal existence, being unauthorized by law. Rev. Stats. Sec. 677 and 737 ; 16 A. 153 ; 29 A. 369. Rifle shooting is an art and not a science. Being unauthorized by law, it can enjoy no public character and cannot appear in a Court of Justice. R. C. C. Art. 446. The members of such an association or partnership are liable *in solido* for damages caused by a wild beast, where by the articles of the association " all property vested in the members jointly." A bear is property and susceptible of private ownership. Rev. C. C. Art. 3415. "If an animal has many masters each will be held solidarily in the noxal action." Digest of the Pandects, Book IX, Tit. 1, No. 14.

Sixteenth—"A corporation cannot commit a crime or an offense in its corporate capacity, although its members may be guilty of these crimes in their individual and respective capacities." Rev. C. C. Art. 443.

Seventeenth—" If a beast kills a man it is murder or manslaughter in the owner." Hale's Pleas of the Crown, Vol. 1, *431 ; Blackstone's Commentaries, Book IV, [197]. The fact that the party who has received wounds, apparently mortal, has been unscientifically treated, or that the treatment is the apparent cause of death, will not excuse the parties whose beast inflicted the wounds or lessen their liability civilly or criminally." Wharton's Criminal Law, § 941.

Eighteenth—The officers of a corporation are its agents (Rev. C. C. 439), and their powers are regulated in the same manner as those of other agents. In cases where directors have acted beyond the scope of their authority, they are personally responsible in damages. 7 R. 464 ; Addison on Torts, Chap. XX, Sec. 2 ; Story on Agency, §§ 309, 311 ; Wharton on Agency, §§ 537, 538, 539, 540, 542.

Vredenburg et al. vs. Behan et al.

Nineteenth—Whether a corporation, association, or partnership may or not be rendered liable for any offense, neglect, imprudence or want of skill or other fault, its liability would not relieve its managers or other officers, or any person who has assisted or encouraged the offense or imprudence or negligence. R C. C. 2216-2317. All participants, aiders and abettors, principals and agents, masters and servants, whether members or officers of a corporation or not, or acting under color of corporate authority, are liable personally and *in solido* for the consequences of their negligence or imprudence or illegal acts or omissions. R. C. C. 2320-2324.

### Thomas J. Semmes on the same side:

First—Where, in an assignment of errors and petition for injunction, appellants have alleged the remission and conventional discharge of appellee's claim and judgment against them, they are estopped from contesting its validity and existence; for the reason that a plea of extinguishment of an obligation admits the existence of the debt. 3 N. S. 273; 12 L. 307; Law R. 2, Privy C. 30; 14 L. 372; 18 L. 6; 14 An. 54; 31 An. 84; 11 An. 172; 2 An. 591; 5 R. 486; 9 An. 528. Such averments resemble the plea of confession and avoidance. Stephens' Pleading, 229.

Second—An assignment of errors is a plea. C. P. Arts. 902, 346. All defenses going to the extinguishment of the action, can be pleaded for the first time in the Supreme Court, where the necessary facts appear from the record. 12 R. 237, 540.

Third—An injunction against an execution, alleging extinguishment and satisfaction of the judgment enjoined, amounts to a recognition of its existence. A party cannot appeal from and enjoin a judgment at one and the same time. (25 An. 538). The injunction amounts to a release of errors in the judgment enjoined. 15 Mo. 441; 3 Scam. 212; 1 Wis. 455. Pleading or taking advantage of a judgment, estops a party from reversing it on error. 17 S. & R. 564; 44 Pa. 247.

Fourth—Judicial confessions amounts to full proof against the party making them, and cannot be revoked. R. C. C. 2291. When contained in pleadings, and not in answers to interrogatories, such confessions may be divided. 4 R. 144; 14 An. 860 and 868.

Fifth—Where defendants have, by pleading remission and conventional discharge of plaintiff's claim, admitted its existence, the sole question left for the Court to determine, is the validity of the defense and not of the demand. A discontinuance of a suit is not a discharge of the claim. C. P. Art. 492. The rules of the Code relative to conventional solidarity are not applicable to torts; and even if they were, the co-debtors *in solido* will not be discharged by settlements made with a part of the obligors, where it is shown that, in making such settlements, reservations of rights and claim were made and are contained in the receipts given by the creditor as required by Arts. 2101 and 2203 R. C. C.

Sixth—The Crescent City Rifle Club, not being a corporation (32 Ind. 138, 169; 7 Lans. 412), is a partnership *quoad* third persons (Coyler, § 53; Story, § 144; 13 L. 300; 6 R. 127; 13 An. 290; 1 Beasl, 31), and the entries in the books are conclusive upon the members, unless proved erroneous. 1 R. 567; 4 N. S. 335.

### Joseph P. Hornor and Francis W. Baker for Defendants and Appellants:

First—Masters and employers are answerable only for the damages occasioned by their servants and employees in exercise of the functions in which they are employed; and such responsibility only attaches when the masters and employers might have prevented the act which caused the damage, and not have done it. C. C. 2320 (2290); 28 An. 7; 18 La. 490; 8 N. S. 504; 15 La. 169; 18 La. 548; 8 La. 539; 17 La. 541; 5 R. 11; 17 An. 166; 17 An. 19; 7 An. 321; 10 M. 187, 497; 2 N. S. 267; 5 N. S. 251; 2 An. 890; 5 An. 134, 426, 424; 11 M. 292; 12 An. 871; 13 An. 207; 14 An. 259; 7 N. S. 198; 4 La. 76; 8 An. 12.

Second—Unless the act was a fault, no damages can be recovered for the act. 24 An. 1.

Third—Negligence is "the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do." Broome's Legal Maxims, p. 330; 11 Exchequer, 785.

Fourth—If the plaintiff or his employee be guilty of negligence which has contributed to the accident, he cannot recover.

Fifth—The intervention of a third person whose act caused the damage, relieves the defendant, even where he be negligent. Wharton, Law of Negligence, § 134.

Sixth—The law of contributory negligence applies to injuries by animals *feræ naturæ*. 99 U. S. 651; 1 Foster & F. 93; 3 Barnwall & Ald. (E. C. L. R.), 304.

Seventh—The existence of a corporation, or the validity of its charter, cannot be inquired into collaterally or incidentally in a suit to which the corporation is not a party, and when such issue is not raised in the pleadings.

Eighth—When the character of a corporation has been approved by the District Attorney as legal, and the same is duly recorded, the individual members are protected by the charter, until such charter be formally decreed void or forfeited in a suit to which the corporation is a party, and where the question is formally put at issue. Revised Statutes, Sec. 677; 13 La. 503; 2 Kent's Coms. 212; Angell & Ames on Corporations, 510; 15 La. 26; 5 An. 179; 9 An. 265; 94 U. S. 673; 44 Barb. 239; 24 Ill. 46; 2 Bos. 166; 24 Ill. 93; 19 Mich. 196.

Ninth—A new trial on the ground of newly discovered evidence, supported by an affidavit in due form, should be granted.

Tenth—A new trial should be granted when the verdict is improper. 2 Hennen, New Trial, I, 1; 17 An. 78; 15 La. 466; 17 La. 336; 9 M. 285; 1 N. S. 713; 24 An. 314; 25 An. 114; 25 An. 374; 10 R. 119.

Eleventh—A party entitled to a jury trial, is entitle to a trial by a jury properly instructed upon the law, and if an erroneous charge be given, the case should be remanded for a new trial. C. P. 516.

Twelfth—Objections to the admission of evidence, properly urged, and carried up on appeal by Bills of Exception, which are called to the attention of the Supreme Court, should be passed upon.

Thirteenth—When an injunction has issued, it can only be set aside after trial and hearing of the parties, and if set aside improperly, and an appeal be taken, the case should be remanded for trial at the cost of appellee.

Fourteenth—Any action by a plaintiff, whereby the security of one defendant against his co-defendant is released, surrendered or diminished, will release the defendant.

Fifteenth—When a party has been guilty of no wilful or intentional wrong, but is in good faith, and is sought to be held consequentially liable for the acts of another, punitive damages will not be allowed, and a verdict for $7500 will be reduced as excessive. 11 An. 292; 14 An. 806; 27 An. 716.

Sixteenth—A defendant is not liable for the costs of a co-defendant as against whom plaintiff has voluntarily discontinued.

Seventeenth—Where the decree does not correspond to the opinion, it should be corrected so as to do so.

The opinion of the Court was delivered by

Todd, J. Mrs. V. Vredenburg, in her own behalf as the widow of William Hazard Vredenburg, deceased, and as tutrix of his minor children, brings this suit against the defendants, and claim from them *in solido* fifty-five thousand dollars damages.

The petition alleges, substantially, that on or about the 30th of October, 1877, the said W. H. Vredenburg had cattle on pasturage in a lot or field situated within the limits of the city of New Orleans, on or

near the junction of the Bayou St. John and Metairie Ridge; that while he was crossing his pasture on that day, in search of his cattle, he was sprung upon by an enormous and ferocious bear, which threw him down and bit him in fifteen places, and lacerated his flesh in a horrible manner, and of the wounds thus inflicted, after suffering excruciating torture and pain, the said Vredenburg died on the 27th of November following; that the bear had been kept on the premises of a society calling itself the " Crescent City Rifle Club," which adjoined Vredenburg's pasture; that under color of being officers and members of said club, though without any lawful right of so using the premises, the defendants having control and possession of the bear, whether owners of him or not, kept him on said premises for their pleasure and use; that the bear was wild and dangerous, and was kept in a negligent manner, and insecurely chained, and broke loose and prowled in the adjoining pasture of the deceased, and was not seen in time to be avoided by him; that by the terror, wounds, excruciating pains, long and torturing illness and mortal injuries inflicted on said Vredenburg, he suffered damages in the sum of $50,000; and his right of action for the same has, by operation of law, survived in favor of his widow and minor children; that the business of the deceased—that of keeping a dairy—was broken up by his illness, and he was forced to sell his cattle and dairy at a loss of $3000, and an expense of $2000 was incurred for medical attendance, medicines, nurses, surgical operations, etc.

The defendants were asked to be cited, and were cited, individually. They first filed an exception, alleging the vagueness of the petition, in not showing whether they were sued because members of the Rifle Club, or individually and apart from such alleged membership, and in not setting forth specifically the items of damage and expenses charged.

The following entry on the minutes shows the disposition made of this exception, which, as it has an important bearing on the case, we quote in full:

" After hearing pleadings and argument of counsel, it appearing from the petition, the prayer thereof, *and the admissions of counsel for the plaintiff, on argument, that defendants are sued individually and not as members of any society or corporation*, and plaintiff having filed a detailed bill for medical attendance, medicines, surgical operations and nurses, in compliance with defendants' exceptions, it is ordered said exceptions be overruled," etc.

The defendants for answer pleaded the general issue.

There were twenty-six persons named as defendants in the petition, some of whom were not cited, others of whom were discharged before or after judgment, leaving only seven of the original number now parties to the suit.

The case was tried by a jury, and from a verdict and judgment against them *in solido* for fifteen thousand dollars, the defendants have appealed. After the rendition of the judgment, an execution was taken out thereon, and W. J. Behan, one of the defendants in the suit in which the judgment was rendered, and one of the appellants in the present appeal therefrom, applied for an injunction against said writ, which was refused by the judge *a quo;* and from this refusal of the judge he took an appeal to this Court; and this injunction case was, by consent, consolidated with the original suit of Mrs. Vredenburg vs. W. J. Behan et al., the pleadings of which we have just recited. The two cases, thus consolidated under the agreement, are to be reviewed and passed on together.

1. The facts out of which this controversy grew are, substantially, as follows:

The defendants were members of an association or society known as the Crescent City Rifle Club.

In July, 1877, the Club, wishing to send some of its members North to participate in an inter-State rifle shooting match, about to take place in New York, for the purpose of providing means therefor, concluded to give an entertainment at Milneburg, on Lake Pontchartrain. The Continental Guards, a military company of the city of New Orleans, to further the object in view, and as a contribution to the proposed entertainment, offered to the Club a bear, owned by the officers of the company, "as a prize to be shot for" on the occasion. The offer was accepted, and a member of the club was instructed to make the necessary arrangements for shooting for the bear.

The entertainment came off on the 3d of August, 1877; the bear was brought on the ground and was offered as a prize, as previously arranged. He was won by William Arms, a member of the club, and one of the defendants. Arms put him up again to be shot for, and this time he was won by another person, who, however, declined to claim the prize. Arms had the bear taken to the grounds of the club, and caused him to be chained to the corner of the club-house; and there the bear remained until the 30th of October, 1877. These grounds had been leased by the club, and the house erected by it belonged, by the terms of their charter, to the members of the club.

The pasture of Mr. Vredenburg, who was engaged in a dairy business, adjoined the grounds of the rifle club, and he and his employees in going to and from the pasture passed through these club grounds. On the evening of the 30th of October, Mr. Vredenburg went to the pasture after his cows; a short time thereafter, as he was returning from the pasture, he was attacked by the bear, which in the meantime had gotten loose, and received the injuries of which he subsequently died.

Tetanus or locked-jaw supervened, attended with great suffering, and his death occurred on the 27th November, twenty-one days after the wounds were inflicted.     It is shown that just after Mr. Vredenburg passed through the club grounds on his way to the pasture, a boy, who was employed by him to assist in driving his cattle, and in his dairy business generally, came into the club grounds accompanied by a small dog, and teased the bear by setting the dog on him; and it was whilst the animal was thus worried, that he twisted his collar off, and ran after the dog and finally encountered Mr. Vredenburg; and just as he attacked him he was whipped by his keeper in an effort to prevent the attack, which only served to enrage him the more.

This last mentioned fact, touching the acts of the hired boy in causing the bear to break loose, is charged to have remotely caused or contributed to the death of the deceased, and is relied on by the defendants as a ground to relieve them of responsibility for the result; and though not strictly in the order of pleading adopted by their counsel, it is well to consider it at once, and eliminate it from the case.

2.   The doctrine of contributory negligence has never been carried to the extent contended for in this instance.   Had the acts referred to been committed by Vredenburg himself, there would be great force in the plea urged; and the principle invoked would be strictly applicable. It is for his own acts, however, in this respect, that a man is bound and for which he must suffer; but he cannot be held equally answerable for the acts, faults and negligence of his employee.

The master or employer is only answerable for the faults of his employee when committed "in the exercise of the functions of his employment, and when he might have prevented the act and not done it.   C. C. 2320.

In this instance, the boy's act was not in the remotest degree connected with his employment; his employer was not present, was not knowing or consenting to it; and it was not in his power to prevent it.

Besides, the responsibility attaching to those who own, control or keep animals *feræ naturæ*, to which class a bear belongs, is of that strict and grave character, as not to be relieved or modified by considerations of the kind presented, nor to be measured by rules that apply to owners or keepers of domestic animals.

Animals of this kind, such as lions, tigers, bears, are universally recognized as dangerous.   It is the duty of those who own or keep them, to keep them in such a manner as to prevent them from doing harm, under any circumstances, whether provoked, as they are liable to be, or not provoked. There must be security against them under all contingencies. Domat, p. 475; Merlin, Répertoire, tome 26, p. 242, verbo Quasi-Delit; Marcadé, tome 5, pp. 272, 273; 1 Law Repts., p. 263; 3 Law Repts., p. 330.

Nor does it matter that an animal of this kind may be to some ex- tent tame and domesticated; the natural wildness and ferocity of his nature but sleeps, and is liable to be awakened at any moment, sud- denly and unexpectedly, under some provocation, as was the case in this instance.

If the defendants are otherwise liable for the acts of the bear, the acts of the boy in provoking him cannot, for these reasons, affect in the least that liability.

3. Another defense urged against the plaintiff's right to recover, is that the defendants are sued in their individual capacity, as admitted in the record, and cannot be held liable for acts done as members of a society, and as stockholders in a corporation known as " the Crescent City Rifle Club."

According to the language of the petition, fairly construed, and the admissions in the record, the suit is against the defendants as individ- uals, and they are not sought to be made responsible as members of a corporation or because of such membership. Their being designated and referred to as members of this rifle club, may be regarded as de- scriptive, and at the same time as bearing directly on the causes and motives that led to the acts and negligences charged against them. It might be argued, and it is in fact urged by plaintiff's counsel, that keep- ing a bear or other wild animal was not one of the objects for which the association or alleged corporation in question was formed, was not within the scope or purposes of its organization; and that it is only for acts done or omitted by a corporation in its corporate capacity, and within the limitation suggested, that it is bound; and that, if the mem- bers of such corporation are guilty of acts of commission or omission entirely foreign to the purposes of the corporation, and not connected with their duties as officers or members of such body, they, the mem- bers, become personally and individually liable.

Under the view that we take of this subject, the question suggested does not properly arise, and it is unnecessary to pass upon it. It is a principle of law that cannot be successfully controverted, that where persons sought to be made liable for their acts, imprudence or negli- gence, seek to escape such liability, by pleading some privilege or im- munity, in derogation of common right, they must clearly establish the existence of the same, and bring themselves strictly within the pro- visions of the law on which they rest such claim. For instance, in this case, when the defendants, sued as individuals, seek to shelter them- selves under the protection of corporate rights and privileges, and by virtue thereof claim exemption from personal responsibility, and the party against whom such immunity is invoked, denies its existence, the court is forced to consider the issue thus presented, and inquire into

the legality of the charter under which the claim is asserted, and see whether their pretensions are well founded and supported by law or not. And we do not concur with the defendants' counsel that such inquiry can only be made in a direct action, attacking the charter of such alleged corporation. There may be some force in such reasoning, when the object of such attack is to have declared the forfeiture of the charter of a corporation admitted to have been legally created, and when such forfeiture is claimed by reason of the violation of its charter; or where the party sued has acknowledged the existence of the corporation by dealing or contracting with it as such; but where in the absence of such conditions, as in this case, it is relied on as a matter of defense to a personal action, and its legal existence is denied, it becomes a legitimate subject of inquiry, and we must determine whether this alleged corporation was created under the authority of any law of the State. 16 An. 153; 29 An. 369; 37 Cal. 354; 46 N. Y. 477; 3 N. Y. 394; 73 Ill. 197; 32 Ind. 138, 169.

Article 446 C. C. provides:

" Corporations unauthorized by law or by an act of the Legislature enjoy no public character, and cannot appear in a court of justice, but in the individual name of all the members who compose it, and not as a political body; although these corporations may acquire and possess estates, and have common interests as well as other private societies."

Was this rifle club a corporation authorized by law ?

It was not chartered by a special act of the Legislature, but claims its existence as a corporate body under the provisions of section 677 of the Revised Statutes of 1870, authorizing the creation of corporations for *literary, scientific and charitable purposes*. And by reference to the act of incorporation, passed before a notary public in conformity to the general law referred to, we find the purposes and object of this corporation, as therein declared, " to be the establishment of a rifle club for the encouragement and advancement of the science of rifle shooting; the establishment of a club-house and ranges, and such other purposes in connection therewith as may be designated by law."

The right of individuals to receive a franchise from the State, and to be endowed with corporate immunities, is a privilege of a high order; and like all other privileges, is *stricti juris;* and the object or purpose on which such privilege is based and from which such right is claimed, must come strictly within the plain intent, terms and meaning of the law.

Guided by this rule, and after a careful examination of the authorities that offered light on the subject, we are constrained to conclude that the declared object of the association in question does not fall within the purview, the letter or the spirit of the law relied on ; that the act of incorporation for such purpose was unauthorized by law, produced no

legal effect and conferred no legal right. In other words, we cannot, by any reasonable rule of construction, term " rifle shooting " a science. It may rightly be called an art—an important art—but it does not rise to the dignity of a science. The distinction between the two, science and art, has been the subject of much erudite discussion, and given rise to some confusion of ideas; but it is a distinction that is now generally accepted, is well defined, and has received authoritative recognition. It may be summed up thus : " Science, in its broadest sense, is knowledge ; " or, as stated by an eminent lexicographer, " the knowledge of many, methodically digested and arranged, so as to be attainable by one ;" a " body of principles and deductions to explain the nature of some matter,"—as mental science, moral science, physical science, etc. " It depends on abstract or speculative principles." "Art relates to practice or performance." It is "practical skill as directed by theory or science," "the mere application of knowledge."

Worcester, Webster, *verbo* Science, Art, Whewall, Davies.

If " rifle shooting" is a science, the term may, with equal propriety, be extended to nearly everything pertaining to the occupations and pleasures of men. And as corporations may be created to promote science, it might multiply corporations *ad infinitum*, until all personal industries and pursuits would be swallowed up and all individual liability cease. The law does not encourage such tendencies and is not so lavish of her favors. We are strengthened in our conclusions on this point by what may be properly regarded as a legislative construction of the law in question, under which this corporation claims to have been established. Section 677 of the Revised Statutes, containing the provision referred to, is but the re-enactment of an original act passed in 1855. Subsequently to the passage of this act, in 1857, with a view doubtless to extend the privileges granted by the act, and, as it were, to enlarge its scope and intendment, the Legislature passed another act for the purpose, as therein declared, " of promoting the love and practice of the fine arts." This last act now constitutes Section 737, R. S. By the " fine arts " is meant, according to the universal acceptation of the term, music, painting, sculpture, etc. If the first act of 1855 was not sufficient to embrace such objects, if science could not and did not include these, we cannot readily conceive how it could embrace " rifle shooting," and authorize the incorporation of rifle clubs. Surely, music and painting and sculpture are nearer a kin to science than rifle practice or rifle shooting, and societies for the promotion and encouragement of the former present a better claim to a " scientific purpose" than the latter. Yet the Legislature virtually declared, by enacting the second act, that the first was too narrow, too limited in its terms and provisions to embrace these fine arts.

The Crescent City Rifle Club never had a corporate existence. To give it or decree it one would be to pervert the plain intent of the law.

Reaching this conclusion, we must regard this club as a voluntary association of persons, and their rights and responsibilities must be tested and determined by the same rules that apply to individuals or members of a private society. Thus, the use of the club grounds and the club building and their appurtenances belonged jointly to the individual members, and such joint proprietorship imposed correlative duties and responsibilities.

4. A great deal of testimony was taken that had little or no bearing upon the real issues involved in the case, and many bills of exception appear in the record embodying the objections to its admission. These objections went mainly to the effect of the evidence, as held by the judge *a quo*, though much of it was wholly irrelevant.

The conclusion we have come to touching the merits of the case, and the disposition we shall make of it, render it unnecessary that we should pass upon these various bills. The salient facts of the case, and upon which our conclusions mainly rest, summarized from the statement heretofore given, are these:

That the bear was accepted by the rifle club as a prize to be shot for under the auspices of the club, and to raise a fund for the purposes of the club; that it was shot for, and subsequently carried to the club grounds by the direction of a member of the club and one of the defendants; that it was kept there and fed there for nearly three months by an employee of the club, and the expenses for its keeping and feeding paid for by the treasurer of the club, and an account of such expenses submitted to the governing committee of the club, of which some of the defendants were members; that it was seen from time to time at the club house by members of the club and by all of the defendants save one; that no one objected to his being there; that whilst thus kept on the club grounds in charge of a keeper, he broke loose, attacked and wounded Mr. Vredenburg, who died of the wounds inflicted.

The Code declares, " that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

That a person is responsible for the damage resulting from "*his negligence or imprudence.*" That he is answerable, not only for his own acts, but for the acts of persons for whom he is responsible, and of *things in his custody.* C. C. 2315, 2316, 2317, 2321.

The law upon this subject is to the same effect under every enlightened system of jurisprudence.

Thus a distinguished writer on this subject has said:

" The mere keeping of an animal of a fierce nature, such as a tiger or bear, or dog known to be wont to bite, is unlawful, and therefore, if

any person is bitten or injured by such an animal, an action is maintainable against the person who keeps it." Addison on Torts, pp. 22, 230.

And again:

" The owner of wild and savage beasts, such as lions, tigers, wolves, bears, etc., if he neglects to keep them properly secured, is liable for injuries committed by them according to their nature, without any evidence that he knew them to be ferocious, or that he was negligent in the mode of keeping them, since he is bound in ordinary prudence, to know that fact and to secure them from doing harm." Sherman and Redfield on Negligence, § 188.

" One who harbors a dangerous animal on his premises, though not his owner in any sense, is nevertheless responsible for injuries committed by it while on or near his premises, to the same extent as if he owned it." Sherman and Redfield on Negligence, pp. 227, 228.

Mr. Justice Blackburn, of the English Court of Exchequer, thus lays down the rule on this subject:

" We think the true rule of law is, that the person, who for his own use or pleasure brings on his land, and collects and keep there any thing likely to do mischief, if it escapes, must keep it at his peril, and if he does not do so is *prima facie* answerable for all the damage, which is the natural consequence of its escape. * * * This is, we think, established to be the law, whether the things so brought be beasts, or water, or filth, or stenches."

Fletcher vs. Rylands, Court of Exchequer, 1 Law Reports, p. 263; see, also, Hale's Pleas of the Crown, vol. 1, 430; May vs. Bourdetts, 9th Adolphus & Ellis (3 Q. B.) U. S. 101; Earl vs. Van Alstein, 8 Barbour, N. Y. 630; 41 Cal. 138.

These principles thus enunciated are sound and have our full approval.

There is a recognition of their spirit in an ordinance of the City of New Orleans on the subject, which declares:

" No wild or ferocious animals shall be kept within the limits of the city, on the premises of individuals, or in menageries, unless such animals be under the charge of an armed guard day and night."

Leovy's City Laws and Ordinances, Art. 703.

And it is to be noted that this bear was kept on the club grounds, within the city limits, in open disregard of this ordinance.

The fundamental principle on which the liability of the defendants rests, is concisely expressed in the following legal maxim, that is as old as the law itself and recognized in every known system of jurisprudence: " *Sic utere tuo ut alienum non laedas.*"

Proprietors or co-proprietors of lands or houses must not permit their property to be put to such uses as to cause injury to others, whether

by being made a refuge for noxious animals or a magazine for gun powder, dynamite or other explosive substances, or as a generator of foul and pestilential vapors destructive of health. And there was a tacit, though clear recognition of this principle by the defendants themselves, or some of them, in calling a meeting after Mr. Vredenburg's death to raise contributions for the relief of his family. No liability was openly avowed or intended to be acknowledged on account of this sad affair by such action, but there was a latent sense of responsibility evidently felt, which found expression in the language of one of the defendants, when testifying as a witness on the trial of the case, and who said by way of explaining the motive that prompted the proposed assistance, " that it was on account of the accident occurring on the grounds of the club."

It is, however, urged in behalf of one of the defendants, W. J. Behan, as sufficient to free him from any liability, that he did not know that the bear was on the premises. Under the circumstances of this case we cannot give such effect to this fact; nor do we consider it as having any real bearing on the question of his liability.

This club was composed of many individuals; it had a complete organization, with regular officers, governing committee, keeper of the grounds, etc. The defendant referred to was the head or chief of the association. Of course from the nature and objects of the organization it was not contemplated, nor was it possible that all the members thereof, the owners of the club-house and lessees of the grounds should occupy the property; and, therefore, it was necessarily placed in the control and keeping of employees of the club, who were charged with its management, and with the proper police and superintendence of the club-house and grounds, and generally with the same duties that the owners themselves were subject to, and who in this respect represented the owners, who were legally responsible for the acts and omissions of such keeper or keepers. Nor can the fact of knowledge or ignorance of the employers touching such acts or omissions on the part of the employee, restrict or enlarge that responsibility. It is a case where the principle of *respondeat superior* applies to its full extent.

A reference to the authorities on this subject leave no room for doubt on this point. Thus a distinguished law writer has declared that " the master is liable for the acts of his servant, not only when they are directed by him, but also when the scope of his employment or trust is such that he has been left at liberty to do, while pursuing or attempting to discharge it, the injurious act complained of. It is not merely for the wrongful acts he was directed to do, but the wrongful acts he was suffered to do, that the master must respond."

" The wrong for which the master shall respond need not be an in-

tentional wrong ; indeed, the liability is commonly all the plainer if it is not. Every man owes to every other the duty of due care to avoid injury ; and whether he manages his business in person or entrusts it to others, he must, at his peril, see that this obligation is observed. If another has suffered an injury through the neglect or improper management of the business, the right of action arises, irrespective of the agency by which the business was conducted."

" It is immaterial to the master's responsibility that the servant at the time was neglecting some rule of caution which the master had prescribed, or was exceeding his master's instructions, or was disregarding them in some particular, and that the injury which actually resulted is attributable to the servant's failure to observe the directions given him. In other words, it is not sufficient for the master to give proper directions, he must see that they are obeyed." Cooley on Torts, pp. 534, 538, 539, 540, 549, 562 ; Sherman & Redfield on Negligence, ₰ 59 ; 14 Howard, 468 ; 15 Ark. 118 ; 36 Vt. 248 ; 11 Minn. 277 ; 98 Mass. 567.

The acts and negligence on the part of the keeper of the grounds and the club-house, first, in receiving the bear on the premises, keeping him there for months, and suffering him to get loose, were all within the scope of his employment, and related directly to the duties with which he stood charged under his employment to properly manage and police the property, and bound him to exclude therefrom all things that might cause injury to others, or if anything dangerous was admitted, then at least to use such care and precautions as to render any injury therefrom impossible, and this brings the case clearly within the meaning and intendment of the authorities we have cited.

5. The defendants, however, claim their discharge from liability by reason of the discontinuance of the suit as to some of the original defendants, and the conventional release of others in consideration of the payment of stated amounts, contending that the legal effect of this was to discharge all, and cite Art. 2203 C. C., which declares " that the remission or conventional discharge of one of the co-debtors in solido, discharges all the others." They say that the effect of the discontinuance entered, was, to suffer the demand, as to such parties, to prescribe, and those against whom the suit was still prosecuted, if decreed to pay the debt, could not compel their co-obligors, thus released, to contribute towards the payment of the debt or towards indemnifying those that were compelled to pay it.

Admitting that the provision of law referred to applies to solidary obligors for a cause of action ex delicto—about which the authorities are not clear, and we express no opinion—still the proposition has no force.

The conventional discharge granted some of the parties, as evidenced by the receipts in the record, contained a reservation of the plaintiffs'

41

rights against the remaining defendants, which reservation, by the very terms of the law, deprived such discharge of the effect ascribed to it as respects the other obligors. And we are aware of no authority that supports the proposition that a mere discontinuance of the suit as to some of the obligors released all the rest. Nor is it true that the claim against the parties, thus discharged from the suit, was extinguished by prescription, for the demand continuing to be prosecuted against a part of those solidarily charged, interrupted prescription as to all.

6. We have been pointed to an alleged error in the verdict and the pleadings taken in connection therewith, and are asked to remand the case on account of it. It is this : The verdict finds in favor of the plaintiff for a stated amount. It is urged that the causes of action set out in the petition are twofold and distinct in favor of different parties. That one demand is in favor of the widow and children, under the special provision declaring that the right of action in the deceased survives to them, and the other in behalf of the succession of the deceased, such, for instance, as the expenses of the last illness and the loss resulting to the dairy business from such illness. There was no exception filed by the defendants to such faulty pleading, but issue was joined, and they went to trial without objecting to it. This might be held a sufficient reply to their complaint as to the form of the verdict, but giving every weight to it, it is no ground for remanding the case, since all the evidence before the jury is now before us, and we can give effect in our decree to the discrimination suggested, so far as the evidence will allow.

The damage from the injury to the business is not fixed, or made in any way certain by the evidence; and we are therefore unable to make any distinct allowance on this item; and the amount proved on account of expenses falls far short of that claimed. We must suppose that the jury was controlled by the evidence, at least to the extent of not allowing anything on any part of the demand that was entirely unsupported by proof, and what they did allow must be attributed to the cause or causes of action that there was some evidence to sustain. The total amount of the verdict must be presumed to have been awarded on the main demand in favor of the widow and minor heirs, except what the evidence shows should be applied to the claim in favor of the succession, as explained above. All that the succession is entitled to recover is on account of expenses of last illness, as stated, and under the evidence this amounts only to the sum of two hundred and sixty dollars.

7. There is, however, one grave error shown by the record, and to the prejudice of the defendants, and which, doubtless, had an important bearing on the verdict of the jury, which must be corrected.

It is this: that in his charge to the jury the judge a quo announced " that damages can be claimed by the heirs of the deceased for the loss

of his life," to which the defendants' counsel reserved a bill. This was clearly erroneous, as shown by frequent adjudications of this Court, which, in effect declare " that an action for damages caused by the killing of a human being cannot be maintained."

Hubgh vs. N. O. & Carrollton R. R. Company. 6 An. 495.

Earhart vs. Carrollton R. R. Co., 17 An. 244.

Frank vs. Same, 20 An. 26.

McCubbin vs. Hastings, 27 An. 716.

The act of 1855, amending article 2315 C. C., expressly limits such right in favor of the widows and minor heirs to the right of action which the deceased would have had, had he survived the injury, and it cannot be extended beyond this. Besides, on referring to the petition, it will be seen that this was the only right of action sought to be exercised in this case, and the demand was positively limited to this.

We must presume that this erroneous instruction to the jury influenced greatly their conclusion as to the quantum of damages allowed. The person killed was shown to have been in the prime of manhood, healthy and vigorous, and with every prospect of longevity ; and his life might, reasonably, have been deemed inestimable to his wife and little children, and we must conclude that a large part of the sum allowed by the verdict was purely for this consideration. Satisfied of this, we are constrained to reduce the amount of the verdict, though urged on this account to remand the case, which we must decline doing, as the entire evidence is before us and we are authorized to make the correction. We are the more prompted to this course by the consideration, that there is nothing in the record, nor in the nature of the demand and the evidence in support of it, that, in the least, involves any turpitude on the part of the defendants, or reflects on their character as gentlemen. Their liability results from a strict application of legal principles, an application just and proper, but one that at the same time may be regarded, to some extent, as technical.

Their fault was that of imprudence and negligence, nothing more. For these reasons, we deem it just to reduce the amount of the verdict to $7,500, which must be credited with the amounts shown to have been paid.

8. The conclusions which we have reached touching the main action and the questions connected therewith, virtually dispose of the injunction case.

Had the injunction been allowed, and tried on its merits, it would have been dissolved, as we have disposed of all the questions involved in the case adversely to the pretensions of the plaintiff in injunction. There might be a question as to whether the allegations of the petition did not, on their face, show a *prima facie* right to enjoin; but we think

it best for the interests of all parties that this vexatious litigation should terminate, and will shape our decree accordingly.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from in case of Mrs. V. Vredenburg vs. W. J. Behan et al., No. 7573, on the docket of this Court, be amended by reducing the amount therein decreed against the defendants W. J. Behan, John Glynn, Jr., George Howe, Dudley Selph, William Arms and William Pierce to seven thousand five hundred dollars, two hundred and sixty dollars of which said sum is to be paid to the succession of W. H. Vredenburg, deceased, and the balance to the plaintiff as the widow of said deceased and as tutrix of his minor heirs; and as thus amended it be affirmed, defendants to pay costs of the lower court and plaintiff of the appeal in said case; and it is further decreed that the judgment in the case of W. J. Behan vs. Mrs. V. Vredenburg et al., No. 7917, be affirmed, plaintiff therein to pay costs of both courts.

---

DISSENTING OPINION.

BERMUDEZ, C. J. Whatever may be the responsibility which attaches to owners of property for the wrongful use of the same by employees entrusted with the keeping thereof, I do not think that it fastens when the owner had not the exclusive control of the property, or having such, was absent, unaware of such use, unable to prevent it, and when such use was not done in, but out of, the course of the legitimate functions or line of the duties of such subordinates, and was not sanctioned and ratified, and could not even have been foreseen.

I think the allowance too large, unless the fact of death, which is entitled to no consideration, assist in the computation and assessment.

I therefore dissent from the decree.

---

POCHÉ, J. I dissent from the opinion of the majority in these cases, and reserve my right to give my reasons in writing at a later day.

---

DISSENTING OPINION.

POCHÉ, J. It is admitted by the majority that the district judge committed a grave error to the prejudice of the defendants in charging the jury, " that damages can be claimed by the heirs of the deceased for the loss of his life;" and that this error had doubtless an important bearing on the verdict of the jury.

It is shown by the record that the jury did not mention in their verdict the elements of damages which they considered, and on which element or causes they predicated their finding; and nothing precludes the

supposition that they may have based their verdict exclusively on the damages caused by the loss of the life of the deceased; in which case their verdict would necessarily be set aside and annulled.

In reviewing their verdict we, therefore, grope in darkness as to what error was committed by the jury, so as to be justified in even cutting down the amount allowed by them to one-half. I, therefore, think that under such circumstances, the case should have been remanded for trial according to law, as it appears, under the erroneous charge of the judge, that the trial which took place was not conducted according to law.

I also earnestly differ from the opinion of the majority in visiting liability on W. J. Behan, who is shown to have been absent from the State when the bear, after it had been shot for and thus disposed of by the club, was brought back to the club grounds and kept there until the day of the accident without Behan's knowledge or consent; and, therefore, without any opportunity on his part to protest against the presence and keeping of the animal on the grounds and thus to prevent the catastrophe which brought about this litigation.

For these reason I dissent from the opinion and decree rendered in this case.

---

## ON APPLICATION FOR REHEARING.

TODD, J. In the body of our opinion in this case, we stated that the amount which we allowed the plaintiff was subject to a credit for the sums shown to have been paid after the judgment of the District Court was rendered. We, however, omitted to state in our decree the total amount of this credit, and this omission should be corrected.

We do not think that the defendants, against whom our judgment is rendered, should be compelled to pay any costs of the District Court accruing by reason of citations issued against some of the original defendants, who were never actually cited, and growing out of the proceedings against others who were subsequently discharged or released by the plaintiff.

It is, therefore, ordered that our previous decree be amended and corrected by declaring the amount thereof ($7500) subject to a credit of six thousand five hundred and eighty dollars ($6580), being the aggregate of the sums paid by some of the original defendants on account of the judgment of the lower court, and that the defendants named in our decree pay the costs of the District Court, except such as grew out of citations and proceedings exclusively against those of the original defendants who either were not actually cited or after citation and judgment were discharged, which costs, with the costs of appeal, are to be paid by

plaintiff, and that the decree heretofore rendered as thus corrected and amended be reaffirmed, and a rehearing refused. .

POCHÉ, J. For the reasons given in my dissenting opinion, I think that a rehearing should have been granted in this case, and I therefore dissent from the opinion of the majority in refusing the rehearing herein prayed for.

BERMUDEZ, C. J., concurs.