352 So.2d 776 (1977)
Barbara Castille VIDRINE, Individually, etc., Plaintiff-Appellee,
v.
Marion Overton WHITE et al., Defendants-Appellants.
No. 6200.
Court of Appeal of Louisiana, Third Circuit.
November 17, 1977.
Rehearing Denied December 14, 1977.
Writ Refused February 17, 1978.
*777 White & Pitre, Joshua J. Pitre, Opelousas, for defendants-appellants.
Sandoz, Sandoz & Schiff by Leslie J. Schiff, Opelousas, Davidson, Meaux, Sonnier & Roy, L. Lane Roy, Lafayette, for plaintiff-appellee.
Before DOMENGEAUX, WATSON and GUIDRY, JJ.
WATSON, Judge.
Defendant, Marion Overton White, has appealed from a jury verdict awarding plaintiff, Barbara Castille Vidrine, $3,000 individually, and $7,000 as natural tutrix of the minor, Ricky Hebert. Ricky, then ten years old,[1] was bitten by a Boxer dog in the White yard on June 1, 1973.
The matter has been to the Supreme Court twice in the interim on ancillary matters. The trial court granted summary judgment in favor of defendant, Allstate Insurance Company, on the issue of coverage, affirmed by this court, 306 So.2d 465, and reversed summarily by the Supreme Court, which found a material issue of fact, 309 So.2d 679. There has also been a Supreme Court ruling in regard to the adequacy of White's suspensive appeal bond. See 328 So.2d 375. A devolutive appeal has now been perfected.
The material factual issue of coverage under the Allstate policy has now been resolved by a jury against White. Allstate was not cast in judgment. White contends that this is erroneous.
In answers to interrogatories, Allstate admitted issuing policy no. 45 355 547 to White. White's undated check for the premium of $213 was endorsed for deposit by Allstate on July 3, 1972. The term of the policy is May 30, 1972, through May 30, 1973. The policy covered "homeowners Bldrs. Risk" on a residence under construction by White in Plaisance and the contents of a residence White rented on North Court Street in Opelousas. The dog-bite took place at North Court Street. Allstate contends that the policy expired by its terms *778 on May 30, 1973, just prior to the dog-bite. Confusing the issue are two affidavits by Allstate employees stating that the policy was cancelled January 14, 1973, for nonpayment of premium. White testified that this was the first basis on which Allstate denied his coverage, and Allstate furnished him no defense to the suit. Plaintiff White's check stubs indicate the premium check to Allstate was written June 23, 1972. White testified in deposition that he sent the check on the same day that he talked to Allstate's agent, Paul Jones, about securing the insurance and stated in an affidavit that he talked to Jones around June 20, 1972. White said the premium was sent directly to Allstate. Agent Jones testified that he issued an oral binder to White on the telephone at 2:00 p. m. on May 29, 1972. White and his secretary, Emily Rose Richard, testified that White was in court in New Iberia that day, leaving before lunch and arriving back after five. Jones said he mailed an application for coverage to the Allstate regional office in Jackson, Mississippi, and the policy was issued. Henry Denton of the Allstate Jackson office testified that White's policy was approved by the Allstate underwriters on May 30, 1972. The policy was written "COD", which meant that the premium was due when it was delivered to the insured. Denton testified that the policy was never renewed by White. White admitted in deposition that he was only interested in coverage for one year, while his new home was under construction and unoccupied. White testified that construction of the new house did not start until June and he did not need or request insurance prior to that time.
Mary Jane Papillion Joury testified that she was employed in White's office as secretary to attorney Joshua Pitre. White's secretary was on vacation, and Ms. Joury typed out the Allstate check and placed a local call for White to Allstate's representative the same day.
There is an evidentiary basis for the jury's conclusion that there was no coverage under the Allstate policy at the time of the accident because it had expired. The jury's decision is free of manifest error.
Appellant White contends that Ricky was a trespasser to whom no duty was owed; that the jury erred in casting White in judgment when the fault, if any, was that of his wife; and that the dog-bite resulted from Ricky's fault, contributory negligence, and assumption of the risk, which make Holland v. Buckley, 305 So.2d 113 (La.1974) inapplicable. In the alternative, it is urged that the award is excessive in view of White's ability to respond in damages.
The White family now resides in the Plaisance community near Opelousas, where they moved June 2, 1973, the day after the accident, which occurred while they were living on North Court Street, Opelousas, in a house rented from James Brown. The lot of the rental house, which measures approximately 200 X 220 feet, was surrounded by a six-foot hurricane fence. The only gate which was used was one in the front, although there were two others in the back. The Whites owned a mixed German Shepherd and a Boxer dog, both grown animals acquired as puppies for protection. The Boxer was not as friendly as the Shepherd. There is no sign warning of the dogs' presence.
The circumstances surrounding the incident are reasonably reflected by the testimony of the various witnesses, as follows:
Mrs. Doris Morain White testified that she saw Ricky Hebert come to the door from her kitchen window and immediately went to meet him because the dogs were at his heels. When she opened the door, Ricky ran inside. She offered to walk Ricky out and told him the dogs would not hurt him as long as he was with her. Ricky appeared frightened. After they walked down the steps, Ricky ran toward the gate and was bitten by the Boxer. Mrs. White was recuperating from a serious illness and could not keep up with him. When Mrs. White reached Ricky she kicked the Boxer in the head and got the boy out of the gate. There were chains at the side of the house which could be used to secure the dogs after they were caught. They did not always come on command.
*779 Both Mr. and Mrs. White admitted that there had been previous complaints about their dogs biting a Mrs. Boutte and an unidentified man.
Mrs. Elizabeth Pitre was driving her husband, Raphael, and Ricky Hebert on their rounds to sell cantaloupes. Mrs. Pitre said that Ricky would not listen or mind. Both Mr. and Mrs. Pitre said they hollered at Ricky not to go in this fenced yard. Raphael said he had cautioned Ricky not to enter any fenced yards. Mrs. Pitre said Ricky and the lady with him were almost to the gate when the dog bit Ricky as he was trying to get out.
Ricky testified that Mr. and Mrs. Pitre came to his mother's home the day of the accident to get him to go peddling with them. Ricky assisted in selling cantaloupes and onions and said he had been told to go to every house. Ricky testified that he did not see the dogs until he knocked on the White front door and they came running from under the house. Mrs. White said she did not want any cantaloupes and would escort him to the gate. According to Ricky, he was still with Mrs. White when he was bitten.
Barbara Castille Vidrine testified that she was separated from Ricky's stepfather, Joseph K. Vidrine. Ricky is one of six children born of her marriage to Simon Hebert, Jr., now deceased. She and the children are supported by social security. Ricky had not had any previous experience in selling door-to-door. Mrs. Vidrine says that Ricky receives poor grades in school because he doesn't pay attention in class. She and her grown daughter alternated in staying with Ricky 24 hours a day during his first week in the hospital. Ricky was unable to walk and was in a wheelchair for approximately two weeks after the accident and then started receiving therapy.
Social worker Lona Bourg testified that Ricky's test scores from school showed a below normal intelligence. The figure given in the records for his I.Q. is 55; his grades and achievement scores are commensurately low. He failed the first grade.
Lona Bourg, Elizabeth Calais and James Harris testified that one could not enter the White yard without being greeted by the dogs at the gate.
Paul Son testified that he witnessed Ricky's accident. He saw Ricky open the gate and enter the yard while the dogs were barking at him. According to Son, Ricky was being escorted back to the gate when he broke away and was bitten.
Celeste Young testified that she had known White all his life and visited the White residence frequently. Each time she visited, she had to blow the horn to get someone to escort her into the yard because of the dogs. It was stipulated that the testimony of Ricky Shaw, the Rev. Shaw and Mrs. Paul Son would be substantially the same as that of Celeste Young.
Ardina Jones, approximately 12 years old at the time of the accident, testified that her home was across the street from the Whites. According to this witness, Ricky broke loose from Mrs. White before he was bitten.
Mrs. Amy Jones, another resident of North Court Street, said the dogs were barking at Ricky when he entered the White gate. She testified that the dogs did not go after Ricky until he left Mrs. White's side.
Sister Ann Catherine Bizilion testified that she visited the White residence on North Court Street frequently and the dogs always jumped up and barked at the gate when she arrived.
Photographs in evidence show a large wounded area on the inside of Ricky's left calf. The Pitres took Ricky to the hospital after the accident. Examination showed puncture bite wounds in the left chest and a 12-inch long laceration on the inner aspect of the left calf with complete loss of tissue in an area approximately 6 inches by 3 inches. Surgery was performed under general anesthesia. The wounds were closed with nylon and wire sutures. A plastic splint was placed on the leg. Ricky remained in the hospital for 20 days receiving physical therapy to help him extend his leg and walk better. Dr. J. G. Patton discharged *780 Ricky with instructions for soap and water scrubs and an office appointment in a week. Dr. Patton noted the possibility of a skin graft being necessary in the future. Dr. Seldon J. Deshotels reported in August, 1973 that Ricky had recovered but had residual scar tissue approximately six inches long and a quarter inch in width which should be watched for keloid formation. Ricky's hospital bill totaled $1729.55 and his doctors' bills $588.
White testified about his debts, including a mortgage of $60,000 on the Plaisance house and property, two loans of $25,000 and $15,000, $1800 on a car, $2,000 on his office and $5,000 or $6,000 in miscellaneous debts, as well as a mortgage on his farm equipment. The Whites have three minor children. Mr. White's net income for 1974 was $6,988.35.
The jury was charged with the duties owed to trespassers, licensees and invitees, respectively. However, Ricky's status as trespasser, licensee, or invitee is not determinative of the duty owed him by the Whites. Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La., 1976).
LSA-C.C. art. 2321 provides in pertinent part that:
"The owner of an animal is answerable for the damage he has caused; . . ."
Holland v. Buckley, 305 So.2d 113 (La., 1974) holds that, when a domesticated animal harms another, the owner of that animal is presumed to be at fault under this article. Defendant White is the owner of the Boxer which injured Ricky and can rebut this presumption only by showing that the harm resulted from some independent cause. The three possibilities are: a fortuitous event; the fault of the victim, Ricky; or the fault of a third person.
There was no fortuitous event.
The evidence indicates that Mrs. White acted reasonably and tried to the best of her ability to keep Ricky from being bitten. No fault on her part has been shown.
According to Mr. and Mrs. Pitre's testimony, they had cautioned Ricky about entering fenced yards and specifically told him not to enter the White yard. While it might have been better for them to employ a boy of greater age and understanding, there is no showing that they were aware that his judgment might be less than that of the average ten-year-old boy. Ricky was, to some extent, being supervised by the Pitres and fault on their part has not been established.
In considering the question of fault on Ricky's part, the rule is that a child of 10 has reached the age of reason and can be expected to follow instructions. Dotson v. Continental Insurance Co., 322 So.2d 284 (La.App. 1 Cir. 1975); writ denied, 325 So.2d 606 (1976). Here, as in Dotson, the dogs were contained in a fenced yard. They were not running loose, as in Holland, supra. In Dotson the dogs were in the back yard and there was unhindered access in the front; here, the fence enclosed the front yard as well. However, in both situations, there was testimony that the child bitten had been instructed not to go inside the fence. Ricky's action in going into the White yard in defiance of instructions and warnings, if the dogs were present and barking, might constitute negligence or fault for the average 10-year-old child. However, even if Ricky's action was faulty for one of normal understanding [Compare Parker v. Hanks, 345 So.2d 194 (La.App. 3 Cir. 1977), writ denied 346 So.2d 224], it must be considered in light of his age, maturity, intelligence and knowledge. Gremillion v. State Farm Mutual Insurance Co., 331 So.2d 130 (La.App. 3 Cir. 1976). Ricky was new to the business of selling door-todoor. He was incapable, perhaps because of mental disability, of heeding instructions given to him and had the mentality of a much younger child. Louisiana courts have generally presumed incapacity in the case of children seven and under. Jackson v. Jones, 224 La. 403, 69 So.2d 729 (1954). Ricky cannot be regarded as a child of ordinary prudence. Whether one is capable of understanding and appreciating a danger is a factual question and the jury here may have concluded that Ricky was not capable *781 of legal fault. The jury may have found that any victim fault on the part of Ricky in entering the yard was not a cause of his injury. He had reached a place of safety inside the house and was bitten as he was being escorted from the yard by Mrs. White. The jury may also have believed Ricky's testimony that he had been instructed to go to every house, fenced yard or not, and that the dogs were under the house when he entered the yard, in spite of the testimony of disinterested witnesses to the contrary. It is certainly more consistent with usual experience to find that he would not have entered the yard if the large dogs were barking at him.
The jury found that contributory negligence, assumption of risk or fault on the part of Ricky, was not proven, and there is a reasonable basis for this conclusion.
It is true that the yard in this case belonged to the dogs, and Ricky, according to the testimony, was not welcome on the premises. However, the Whites' animals, although not vicious, were at least dangerous, and the Whites were on notice from past complaints that there was a possibility of their biting one on the premises. See the discussion in Vredenburg v. Behan, 33 La.Ann. 627 (1881).
Under these circumstances, defendant White, as head and master of the community owning the dogs, must be considered responsible for the damage inflicted by the Boxer. LSA-C.C. art. 2404.
The remaining issue is White's contention that the award is excessive in view of his ability to respond in damages. The award by the jury can, of course, be reduced only if an abuse of its much discretion is shown. LSA-C.C. art. 1934.
Defendant White has shown considerable indebtedness and a limited annual income. However, a total award of $10,000 is not so disproportionate to White's income as to constitute an abuse of the jury's much discretion. Compare Smith v. Girley, 242 So.2d 32 (La.App. 1 Cir. 1970).
For the foregoing reasons, the judgment of the trial court herein is affirmed at the cost of defendant-appellant, Marion Overton White.
AFFIRMED.
NOTES
[1] Ricky had his 11th birthday on June 4, 1973, shortly after the accident.