839 So.2d 1050 (2003)
Kerry McCOY and Theresa McCoy, Plaintiffs-Appellees,
v.
Ronnie LUCIUS and Mildred Lucius, Defendants-Appellants.
No. 36,894-CA.
Court of Appeal of Louisiana, Second Circuit.
March 5, 2003.
Rehearing Denied April 3, 2003.
*1051 Lavalle B. Salomon, Monroe, Counsel for Appellants.
William H. Hallack, Jr., Monroe, Counsel for Appellees.
Before GASKINS, CARAWAY and MOORE, JJ.
GASKINS, J.
The defendants, Ronnie and Mildred Lucius, appeal from a judgment awarding damages to the plaintiffs, Kerry and Theresa McCoy, as a result of injuries sustained by the McCoys' dog. For the following reasons, we reverse.

FACTS
The plaintiffs and the defendants are neighbors in West Monroe, and this lawsuit concerns injuries suffered by the McCoys' dog in a fight with two dogs kept by the Luciuses.
The McCoys own a 10-pound Maltese dog named Jody. The dog is approximately 12 years old. Although Jody was a small dog, she had a reputation in the neighborhood for aggressiveness. Mr. McCoy described Jody as "one of those little yapping dogs." On previous occasions while running free, Jody had bitten several neighborhood residents. One resident testified that Jody had charged her and her dog, causing her to fall, break her arm and knock her tooth loose; she said that she did not tell the McCoys that this had occurred because her insurance paid her medical bills. Mrs. Lucius said that she first met the McCoys after Jody bit one of the Luciuses' grandchildren. After another biting incident where the victim required medical attention, the McCoys decided to keep Jody leashed in their yard when outside, along with their other dog, Max.
The Luciuses were caretakers of two dogs that belonged to their grandchildren. One of these dogs was a weimaraner named Trunks that at the time of this incident was between six and nine months old, two feet tall and weighed about 60 pounds. The other dog was a boxer *1052 named "Prince Vegeta" that was slightly older than Trunks. Mrs. Lucius said that for a time these dogs were kept inside the house and were occasionally allowed outside to play; other neighbors said that the dogs routinely ran loose in the neighborhood and overturned trash cans.
Mr. McCoy said that on January 1, 2001, he broke up a fight between the Luciuses' boxer and another neighborhood dog near his property. Both dogs had apparently been wandering loose; Mr. McCoy said that the boxer was very aggressive toward the other dog. Mrs. Lucius did not recall this incident even though Mr. McCoy said that he had brought the injured dog and the boxer to the Luciuses' house and told Mrs. Lucius about the fight. Mr. Lucius said that he vaguely remembered the incident.
In another incident shortly after Easter in 2001, a neighbor saw the Luciuses' boxer carrying a dead rabbit in its mouth on the McCoys' property. The rabbit had been one of at least two rabbits that were Easter presents from the McCoys to their young daughters. The McCoys discovered that the rabbits' cage had been destroyed and that the cage was full of dog hair. The Luciuses offered to pay for the damages, but nothing further was said about the incident and no payment was made. The boxer may also have killed rabbits belonging to another neighbor earlier in the year. Shortly after the incidents with the rabbits, the dogs were picked up and placed in the pound. After being informed of that fact by their veterinarian's office, the defendants picked up the dogs.
By May 2001, Mrs. Lucius was keeping the dogs in a pen in her yard. She also said that the dogs had been to obedience school. At that time, no fence separated the property of the McCoys and the Luciuses. On May 9, 2001, Mrs. Lucius was in her yard exercising the weimaraner and boxer; she said that the dogs were on leashes. She described the ensuing events:
A: I was putting my dogs up in their port-a-pen beside Ronnie's garage and their dogs (sic) ran up the hill right there. It's kind of sloped there and the dog ran up charging us. And when it did, these two jumped on it. I could not hold them.
Q: Did your dogs get loose from their leash?
A: Yes, they did, out of my hand.
Q: And what happened when they got loose from the leash?
A: Then they started ... that dog was still coming and they ran that a way and the dog was still barking and then it turned and run because they were nipping at it then. And it started running and they caught it right down there around Ronnie's shop, right behind his shop.... The dog ... one had one end and one had the other and the dog just... I thought they had killed the dog....
Mrs. Lucius was the only witness to the dog fight. She said that she did "nothing" when the dogs attacked the little dog. Mrs. Lucius said that she had the dogs in her sight the entire time of the incident and at no time did they go onto the McCoy's property. Mr. Lucius said that he came out to put the boxer and weimaraner in their pen and saw Jody lying on his property.
The McCoys' other dog, Max, was leashed to the McCoys' tree during the entire incident. Mr. McCoy said:
A: Both my dogs were on those ["screw-type deals (with a) chain (and) a cable."] And when I got outside, what I saw was the screw was in the ground, the cables are there and there's a leash and the leash is not broken, the leash is hooked together like it always is and there's hair about and it looks like to *1053 me, that the dog was just pulled through its own collar.
[Objection by defense counsel.]
A: Well, with hair there and, you know, what was left there, it looked that way to me. So
Q: Did you see hair anywhere else?
A: Yeah, about 10 or 15 further down towards the lake, on my property there was a whole bundle of hair. I would say a foot radius or so.
Madge Smith, who lives across the street from the Luciuses and McCoys, said that she was standing in her driveway on May 9, 2001 when she saw the Luciuses, along with their daughter Cindy and her husband Doug, walking from their house towards the McCoys' house. Ms. Smith said that one of them was carrying an empty folded black plastic bag. She said that the group walked "to the backyard behind the house, behind the McCoys' house, in their backyard" to a point where she could no longer see them. She said that the group returned a few minutes later carrying the bag "with something in it."
Doug Haynes, the Luciuses son-in-law, said that he and his wife, Cindy, came to the Luciuses' house after being called and found Jody lying behind the carport on the Luciuses' property. Believing that the dog was dead, Doug put the dog in a bag. Cindy Haynes said that Jody was lying on the Luciuses' property and that she carried the bag containing Jody and put the bag in the back of her car.
Mrs. Lucius called Mrs. McCoy who then came over and got her dog. Some harsh words were passed among the parties. Mrs. Lucius testified that she overheard Mrs. McCoy telephone someone and say "Jody is dead and it's all my fault and I don't guess I put his collar on tight enough." Soon thereafter, Mrs. McCoy discovered that the dog was alive. Mrs. McCoy took the dog to the veterinarian. Jody was treated for 12 days and released; the veterinarian's bill was for $462.58. The dog made a full recovery from her injuries.
The McCoys sued the Luciuses for Jody's veterinary bill, as well as for damages for the loss of their rabbits and cage. The Luciuses answered the lawsuit with general denials, but did not plead comparative fault. After hearing the evidence, the court ruled in favor of the McCoys on the claim for the rabbits, but took under advisement the claim regarding the veterinary bill. The court subsequently issued a judgment in favor of the McCoys, finding that the "defendants failed to establish by a preponderance of the evidence that they were free from fault." The court stated that the defendants knew or should have known of the dangerous propensities of their dogs and that the damage caused by the dogs could have or should have been prevented. The Luciuses now appeal.

DISCUSSION
The defendants argue that the trial court erred in granting recovery to the plaintiffs for their veterinary bill.[1] This argument has merit.
Prior to 1996, under La. C.C. art. 2321, the master of a domesticated animal was presumed to be at fault when the animal harmed another. The nature of the fault was strict liability. The plaintiff was required to prove that the defendant owned the animal causing the harm, that the animal created an unreasonable risk of harm, and that the damage occurred through this risk. The standard of strict liability required that the damage be caused by a *1054 vice or aspect of the thing which created an unreasonable risk of harm. Unlike the standard of negligence, a defendant was liable for harm caused by a thing whether or not he was aware of the unreasonable risk of harm. The defendant could escape liability by showing that the harm was the fault of the victim, the fault of a third person for whom he was not responsible, or by a fortuitous event.
In 1996, La. C.C. art. 2321 was rewritten and now provides:
The owner of an animal is answerable for the damage caused by the animal. However, he is answerable for the damage only upon a showing that he knew or, in the exercise of reasonable care, should have known that his animal's behavior would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nonetheless, the owner of a dog is strictly liable for damages for injuries to persons or property caused by the dog and which the owner could have prevented and which did not result from the injured person's provocation of the dog. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. [Emphasis supplied.]
By the 1996 revision, the legislature has abolished strict liability under this article for damage caused by animals other than dogs. However, the revision retains strict liability for dog owners. As a result of this revision, there is no longer any reason for the court, in determining liability, to consider whether the dog owner knew or should have known that the dog's behavior would cause damage or whether the dog owner failed to exercise reasonable care as would have prevented the damage. Pepper v. Triplet, XXXX-XXXX (La.App. 1st Cir.12/20/02), 834 So.2d 624. The effect of the 1996 revision is a three-part test for assessing the liability of a dog owner. First, the dog must have actually caused the damage to the plaintiff's person or property. Second, the owner must have been able to prevent the damages, but failed to do so. Third, the damages must not have been caused by the injured person's provocation of the dog. Allen v. State Farm Fire and Casualty Company, 36,377 (La.App.2d Cir.9/18/02), 828 So.2d 190, writ denied, 2002-2577 (La.12/19/02), 833 So.2d 343. See also Pepper v. Triplet, supra.
The trial court's reasons for judgment do not show that the court explicitly considered and applied the revised version of La. C.C. art. 2321 to the facts presented. The court stated that the defendants failed to establish by a preponderance of the evidence that they were free from fault. The court ruled that the defendants knew or should have known of the dangerous propensities of their dogs and the damage was a foreseeable risk of harm that the defendant could have prevented. Because the court did not apply the law as written in the 1996 revision of the code article, the correct burden of proof was not applied. Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable and, if the record is otherwise complete, the reviewing court should make its own independent de novo review and assessment of the record. See Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502. Therefore, we will conduct a de novo review of the issues presented in this matter.
There is no dispute that the dogs kept by the defendants caused the damage to the plaintiffs' dog. The two remaining elements of La. C.C. art. 2321 are whether the owner was able to prevent the damage, *1055 but failed to do so, and whether the defendants' dogs were provoked.
We find that the defendants' dogs were provoked. Mrs. Lucius testified that Jody charged her and her dogs at the commencement of the incident, and she said that Jody was "still coming" when her dogs escaped from her control. She testified:
Q: And what was the maltese doing? Was it just coming up and licking you on the leg or licking the other dogs?
A: No, it came up barking and running. I mean, just like it was just fixing to get us.
Q: Okay. And that obviously got the attention of the two somewhat larger dogs?
A: Correct.
Q: And then they got loose because of the other dog running toward them, I guess, yipping, for lack of a better term?
A: Yeah.
Also, as noted, Mrs. Lucius was aware of Jody's reputation for aggressive behavior and she said that Jody continued to charge until her dogs escaped from her control. The overwhelming majority of the evidence placed the site of the incident on the Luciuses' property, and while this does not absolve the Luciuses from responsibility, it tends to corroborate Mrs. Lucius' testimony that Jody provoked the incident by charging her two dogs on their territory.[2]
La. C.C. art. 2321 speaks of "the injured person's provocation of the dog" (emphasis added). This raises the question of whether the defense of provocation may be raised in a case for damages to a dog. There are comparatively few "dog-bites-dog" cases in the jurisprudence, see, e.g., Goldberg v. Ruckstuhl, 408 So.2d 374 (La.App. 1st Cir.1981), and none since the revision of La. C.C. art. 2321. However, we find that provocation under La. C.C. art. 2321 may be imputed to animals as well as to people. The defendants clearly established through independent testimony that Jody was prone to be aggressive toward people and other dogs. A dog that aggressively charges another dog may provoke an aggressive response from the dog being charged, and that appears to be what occurred in this case.
Although the defendants' dogs caused the damage to the plaintiffs' dog, the attack was provoked by the plaintiffs' dog. Because the plaintiffs failed to prove an unprovoked attack on their dog by the defendants' dogs, under La. C.C. art. 2321, they failed to carry their burden of proof in this case.

CONCLUSION
For the reasons stated above, we reverse the trial court judgment granting recovery to the plaintiffs for the injuries sustained by their dog. The unfortunate injuries to Jody and the resulting damages for her veterinary care are not the responsibility of the Luciuses. The uncontroverted evidence shows that the small dog charged the larger dogs as if to attack them and that this provoked the larger dogs to attack Jody.
Accordingly, we hereby reverse that portion of the trial court judgment granting recovery to the plaintiffs for their veterinarian *1056 bill in the amount of $462.58. The award of $50 for the rabbits and cage is not before us on appeal and is not affected by this reversal. Costs of this appeal are assessed to the plaintiffs, Kerry and Theresa McCoy.
REVERSED.

APPLICATION FOR REHEARING
Before WILLIAMS, GASKINS, CARAWAY, KOSTELKA, and MOORE, JJ.
Rehearing denied.
NOTES
[1] The defendants do not argue that the trial court erred in granting recovery to the plaintiffs in the amount of $50 for the loss of their two rabbits and the destruction of the cage.
[2] We note that La. C.C. art. 2321 makes no exception to strict liability for damages incurred by trespassers as such, so the fact that Jody was on the Luciuses' property is irrelevant to this portion of the inquiry. Compare Pepper v. Triplet, supra, citing Vidrine v. White, 352 So.2d 776 (La.App. 3d Cir.1977), writ denied, 354 So.2d 1376 (La.1978). The Luciuses were not the owners of these dogs, but they were the dogs' masters and harbored the dogs on their property. The jurisprudence has extended the liability under the various iterations of La. C.C. art. 2321 to such persons. See, e.g., Thompson v. Sicard, 385 So.2d 334 (La.App. 1st Cir.1980), writ refused, 386 So.2d 355 (La.1980).